UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| ROBERT FEDUNIAK and MAUREEN FEDUNIAK,<br><br>Plaintiffs,<br><br>v.<br><br>OLD REPUBLIC NATIONAL TITLE COMPANY,<br><br>Defendant. | Case No. 13-cv-02060-BLF<br><br>**ORDER RE MOTION IN LIMINE NO. 3 TO EXCLUDE PLAINTIFFS' PROPOSED EXPERT, TERRY LLOYD** |

On April 24, 2015, the Court held a *Daubert*[1] hearing to address Defendant's Motion in Limine No. 3 to Exclude Plaintiffs' Proposed Expert, Terry Lloyd. The Court has considered the written submissions of the parties, the testimony of Terry Lloyd ("Lloyd"), and the oral argument of counsel presented at the hearing. For the reasons discussed below, the motion is GRANTED.

**I.      LEGAL STANDARD**

Federal Rule of Evidence 702 provides that a qualified expert may testify if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993), the Supreme Court held that Rule 702 requires the district court to act as a gatekeeper to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable."

In *Daubert*, the Supreme Court discussed four factors that may be used to determine reliability: (1) whether the theory or technique used by the expert "can be (and has been) tested";

---

[1] *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

(2) "whether the theory or technique has been subjected to peer review and publication"; (3) "the known or potential rate of error"; and (4) whether there is "general acceptance" of the theory or technique in the "relevant scientific community." *Daubert*, 509 U.S. at 593-94; *see also Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 463 (9th Cir. 2014) (reciting factors).

In *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999), the Supreme Court clarified that the "basic gatekeeping obligation" articulated in *Daubert* applies not only to scientific testimony but to *all* expert testimony. The Supreme Court also made clear that the four factors discussed in *Daubert* "do *not* constitute a definitive checklist or test" for reliability. *Id.* at 150 (internal quotation marks and citation omitted). The reliability inquiry is a flexible one, and "whether *Daubert's* specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine." *Id.* at 153. The Ninth Circuit has held that another "very significant fact to be considered is whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995). While opinions developed expressly for litigation are not necessarily unreliable, the district court "may not ignore the fact that a scientist's normal workplace is the lab or the field, not the courtroom or the lawyer's office." *Id.*

The district court "also has broad latitude in determining the appropriate form of the inquiry." *Barabin*, 740 F.3d at 463. Pretrial *Daubert* hearings are commonly used but they are not required. *Id.* However, the district court must make explicit findings with respect to relevance and reliability. *See id.* at 464; *United States v. Jawara*, 474 F.3d 565, 583 (9th Cir. 2007). In making those findings, the district court must address the soundness of the expert's methodology, not the correctness of his or her conclusions. *See Barabin*, 740 F.3d at 463. "The duty falls squarely upon the district court to act as a gatekeeper to exclude junk science that does not meet Federal Rule of Evidence 702's reliability standards." *Id.* (internal quotation marks and citation omitted). The district court must take care not to act as a fact finder. *Primiano v. Cook*, 598 F.3d 558, 564-65 (9th Cir. 2010) ("[T]he district judge is a gatekeeper, not a fact finder.") (internal

1 quotation marks and citation omitted). "When an expert meets the threshold established by Rule 702 as explained in *Daubert*, the expert may testify and the jury decides how much weight to give that testimony." *Id.* at 565.

## II. DISCUSSION

The parties agree that under the title insurance policy issued by Defendant, Plaintiffs are entitled to recover the diminution in value of the property caused by the undisclosed easement, measured as of the date the easement was discovered, August 31, 2001. *See Overholtzer v. Northern Counties Title Ins. Co.*, 116 Cal. App. 2d 113, 130 (1953) ("liability should be measured by diminution in the value of the property caused by the defect in title as of the date of the discovery of the defect"). Plaintiffs offer Lloyd's testimony on this point. Defendant challenges both the relevance and the reliability of Lloyd's testimony.

Evidence is relevant if it will "'assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Daubert*, 509 U.S. at 591 (quoting Fed. R. Evid. 702). "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Id.* (internal quotation marks and citation omitted). This consideration has been described as one of "fit" – "whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Id.* (internal quotation marks and citation omitted). Lloyd proposes to testify that the diminution in value caused by the easement, measured in August 2001, was approximately $6.8 million. Defendant argues that Lloyd does not offer a sufficient basis for opining that the asserted diminution in value was *caused* by the easement, and thus that his opinion is not relevant. Based on Lloyd's testimony and report, it appears that he opines that his index was designed to incorporate all market forces that bear on valuation such that only the easement would be identified as the cause for the diminution in value. Thus, Defendant's challenge more properly goes to the reliability of Lloyd's opinion rather than its relevancy. Because Lloyd's testimony addresses the precise issue that the jury must determine, it is relevant.

The more troubling question is the testimony's reliability. Lloyd is not a real estate appraiser. He testified that he is a certified public accountant and a chartered financial analyst. His practice has focused on valuing closely held assets in the context of transactions, tax,

3

financing, and disputes. He has no experience in the appraisal of real property.

Lloyd acknowledged that he did not use the preferred means of determining real property value, the sales comparison approach. *See United States v. 33.5 Acres of Land, More or Less, Okanogan County, State of Wash.*, 789 F.2d 1396, 1400 (9th Cir. 1986) ("The preferred means of determining that value is by referring to sales of comparable property."). He testified that for the purposes of rendering an expert opinion regarding diminution in value caused by the easement, he created an index for measuring changes over time in prices of high-end real estate in Pebble Beach. To construct his index, which he calls the "Pebble Beach Index," he used real estate sales data maintained by a broker and consultant in the Pebble Beach area. That data base included all sales in Pebble Beach from 1985 to the present. Of the approximately 1900 sales transactions listed, Lloyd applied certain filters to extract 171 transactions that involved comparable properties, although he testified that he was not personally familiar with any of those properties. The filters used included limitations to sales no earlier than 1999, square footage of at least 3,000 feet, lot size of more than one-half acre, and sales price of at least $3 million. The filters did not identify properties with similar easement restrictions.

The data base was further refined by eliminating the outlying sales, which reduced the total number of transactions selected for Lloyd's Pebble Beach Index to 163. Lloyd next created a price per square foot index for each year for the period 1999 through 2014. All values in each calendar year were averaged to determine a "Unit Price Index Value." Those index values were then used to calculate the percentage change in the selected sample over time. Lloyd acknowledged that year to year the index utilized data from sales of different properties, rather than charting the sales of the same properties year to year. Thus the index calculated the average rate of change in value based upon distinct groups of 10-12 properties for each year. *See* Lloyd Report, Oct. 22, 2014, ¶¶ 21-24.

Once Lloyd derived the average yearly percentage change in value, he applied the model to determine the specific value of Plaintiffs' property on August 31, 2001 both with and without the easement. To obtain the value without the easement, Lloyd assumed that the $13 million price that Plaintiffs paid for the property was the fair market value ("FMV") in November 2000. He

4

1  then applied his Pebble Beach Index to that $13 million figure to conclude that in August 2001 the

2  FMV of the property without the easement was $14.7 million.

3        Lloyd applied a similar method to determine the August 2001 FMV of the property with

4  the easement. His starting point for that calculation was a contract for sale of the property that

5  Plaintiffs entered into in October 2014. Although the buyer ultimately backed out, Lloyd assumed

6  that the $9 million price reflected in the cancelled contract was the FMV of the property with the

7  easement as of October 2014. It was uncontested that the purported buyer in 2014 was fully

8  advised of the conservation easement. Lloyd applied his Pebble Beach Index to determine that if

9  the property with the easement had a FMV of $9 million in October 2014, the property with the

10  easement had a FMV of approximately $7.9 million in August 2001.[2] Lloyd referred to the

11  process of rolling back the FMV from October 2014 to August 2001 as "backcasting."

12        Lloyd subtracted the August 2001 FMV of the property with the easement ($7.9 million)

13  from the August 2001 FMV of the property without the easement ($14.7 million) to arrive at a

14  diminution in value of approximately $6.8 million. He performed a "sanity check" by comparing

15  the property values derived using his Pebble Beach Index with property values derived using two

16  other indices, the First Republic Prestige Home Index ("First Republic Index") and the Case-

17  Shiller Index. The First Republic Index reflects property values over time in certain geographic

18  areas. Lloyd reviewed the First Republic Index for properties in San Francisco, San Diego, and

19  Los Angeles. The Case-Shiller Index reflects broad national average changes in real property

20  values over time. Lloyd concluded that the diminution in value of the property calculated with his

21  Pebble Beach Index fell between the diminutions in value calculated using the First Republic

22  Index and the Case-Shiller Index, and that this cross-check indicated the reliability of his Pebble

23  Beach Index.

24        In evaluating Lloyd's methodology for reliability, the Court begins with the four factors

---

[2] At one point during Lloyd's testimony at the *Daubert* hearing, he stated that the August 2001 FMV of the property with the easement was $7.8 million rather than the $7.9 million reflected in his report. Lloyd was summarizing the graph at page 10 of his report at the time, which is somewhat difficult to read. Later in his *Daubert* testimony, Lloyd used the $7.9 million figure from his report. The Court presumes that Lloyd simply misread the graph or misspoke and that his trial testimony would be consistent with his written report.

discussed in *Daubert*. The first factor is whether the methodology can be and has been tested. Lloyd testified that he tested his Pebble Beach Index against two well-known and respected indices, the First Republic Index and the Case-Shiller Index. However, he has not provided an adequate basis for that comparison. The latter two indices do not appear to be relevant to the value, over time, of properties in the Pebble Beach area. The First Republic Index does not even include Pebble Beach properties and the Case-Shiller Index is a broad national average of changes in real estate prices based upon repeat sales of millions of homes. Lloyd acknowledged that he was not aware of the methodologies used by either of his "sanity check" indices or whether either one purported to be valid. The First Republic and Case-Shiller indices were not developed for the same purpose as the task at hand – Lloyd acknowledged that neither index had been designed for the purpose of valuing a distinct property. If Lloyd sought to test his index, it is curious that he did not test it against the sales comparison method; perhaps he simply lacked the skills to do so. Finally, Lloyd testified that the testing he did to verify his Pebble Beach Index was conducted by his own staff. Accordingly, the Court concludes that Lloyd's methodology has not been reliably or independently verified.

The second factor is whether the methodology has been subjected to peer review and publication. Lloyd testified at the *Daubert* hearing that it had not.

The third factor is the known or potential rate of error of the methodology. Lloyd testified that he eliminated transactions that were outside of two standard deviations of the mean. While that is a generally accepted method in statistical work, Lloyd did not testify that eliminating outlying transactions was sufficient to identify the potential error rate of his methodology. Thus, there is no evidence of the potential error rate. Insofar as this would be the one and only time the Pebble Beach Index would be applied to real property valuation, the jury would be left completely in the dark about any error rate.

The fourth factor is whether the methodology is generally accepted in the relevant scientific community. There is no evidence before the Court that use of an index such as the Pebble Beach Index is generally accepted as an appropriate method for calculating diminution in value by professionals who regularly value real property.

6

1	The Court next considers the "very significant fact" that Lloyd's methodology was developed for this litigation. *See Daubert*, 43 F.3d at 1317. While that fact alone would not be sufficient to render his testimony unreliable, this Court "may not ignore" that the methodology was not created, and is not used, in the field of valuing real property. That fact, combined with the *Daubert* factors discussed above, undermine any confidence in the reliability of Lloyd's testimony. The Court certainly is aware that traditional appraisal is not the sole reliable method for valuing real property. However, in considering the recognized tests for reliability of new methods, this one simply does not measure up, especially when developed by a person with absolutely no experience in valuing real property.

The Court also is extremely concerned that Lloyd applied the index to assumptions for which he did not have sufficient rational bases. For example, Lloyd assumed that the $13 million that Plaintiffs paid for the property was the FMV at the time of purchase. He testified that he made that assumption because Plaintiffs' purchase of the property was an arm's length transaction. However, Lloyd did not establish a basis for believing that an arm's length transaction necessarily reflects FMV nor did he acknowledge that there are numerous other factors relevant to the determination of FMV. For example, the Court asked Lloyd whether he had ever seen an arm's length transaction in which someone overpaid, either for emotional reasons or because the purchaser was extremely wealthy. Lloyd testified that yes, he had seen such transactions, and characterized the value that a buyer is willing to pay in those situations as "a strategic value." When the Court asked how he distinguished between transactions in which the buyer paid FMV from those in which the buyer paid a strategic value, Lloyd did not have a satisfactory response. In a similar vein, Lloyd did not explain satisfactorily why a $9 million price set forth in a cancelled sales contract is an appropriate measure of FMV in October 2014. He simply failed to lay an adequate foundation for his assumptions in his report, his deposition, or his *Daubert* testimony. In fact, he testified that he did nothing to independently verify the assumed FMVs because, in his opinion, no such verification was necessary.

If these concerns regarding the foundation for Lloyd's assumptions were the only problems with his testimony, the Court might permit the testimony and leave it to Defendant to argue to the

7

jury that the assumptions underlying Lloyd's calculations were incorrect.[3] However, for the reasons discussed above and on the record at the *Daubert* hearing, the Court concludes that Lloyd's methodology itself is not sufficiently reliable to pass muster. His Pebble Beach Index, which has never been used to value property before and likely never will be used again, simply does not present the degree of reliability required under Rule 702. Departure from the sales comparison approach, widely regarded as the best method of valuing real property, requires a showing of reliability starkly absent here. Plaintiffs offer a novice in the real estate field (although an impressively qualified financial analyst) who invented an "index" for measuring diminution in value without using any of the recognized tools for independent verification of his results. Lloyd's price trend index is offered as support for his opinion of actual FMV. The Court concludes that Terry Lloyd is not qualified to offer such opinions, as he has demonstrated neither the requisite expertise nor a reliable basis for doing so.

Accordingly, Defendant's motion is GRANTED and Lloyd's opinion and testimony are EXCLUDED. Lloyd's exclusion comes several weeks before trial, such that Plaintiffs have adequate time to retain and disclose an alternative expert. The Court has considered Defendant's objection to such disclosure and has concluded that any prejudice to Defendant may be addressed by requiring Plaintiffs to pay the costs of deposing an alternative expert.

### III. ORDER

(1) Defendant's Motion in Limine No. 3 to Exclude Plaintiffs' Proposed Expert, Terry Lloyd, is GRANTED and Lloyd's opinion and testimony are EXCLUDED.

(2) Plaintiffs may disclose an alternative expert and expert report on or before May 5, 2015; any such expert must be available for deposition not later than May 12, 2015; and Plaintiffs shall pay the costs of that deposition.

Dated: May 1, 2015

_____
BETH LABSON FREEMAN
United States District Judge

---

[3] At the hearing, Plaintiffs' counsel argued that other evidence would be offered to support the assumptions that the $13 million and $9 million figures represented FMV.

8